UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

F I L E

MAY 2 3

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA,     )
    )
    Plaintiff,     )
    )
    v.     )     Case No. 1:10-cv-01054(TSE/IDD)
    )
HEDGELENDER, LLC, et al.,     )
    )
    Defendants.     )
    )

## REPORT AND RECOMMENDATION

This matter is before the Court on the United States' ("Plaintiff") Motion for

Default Judgment against HedgeLender, LLC ("Defendant" or "HedgeLender") (Dkt. No.

19.)[1] After a representative of Defendant failed to appear at the December 17, 2010

hearing, the undersigned Magistrate Judge took this matter under advisement. Upon

consideration of the Complaint, Plaintiff's Motion for Default Judgment and the

supporting affidavits therewith, the undersigned Magistrate Judge recommends that

default judgment be entered against Defendant.

## I. INTRODUCTION

On September 22, 2010, Plaintiff brought this action against the Defendant, and

others not subject to this motion, pursuant to 26 U.S.C. §§ 7402(a) and 7408 to

permanently enjoin the Defendant from organizing and promoting tax fraud schemes and

---

[1] Plaintiff's Motion for Default Judgment was originally filed as to Defendants William Chapman, Alexander Capital Markets, LLC, Alexander Financial, LLC, and Defendant. (Dkt. No. 19.) However, subsequent to the filing of the Motion, the Plaintiff entered into a consent injunction with the other Defendants in default. (Dkt. Nos. 24, 25.) Therefore, Plaintiff now moves this Court for Default Judgment as to Defendant only.

engaging in other conduct that, pursuant to 26 U.S.C. §§ 6700, 7402, and 7408, interferes

with the administration and enforcement of tax laws. (Compl. ¶¶ 3-6.)

## A.  Jurisdiction and Venue

Rule 55 of the Federal Rules of Civil Procedure provides for the entry of default

judgment when "a party against whom a judgment for affirmative relief is sought has

failed to plead or otherwise defend." The court must have both subject matter and

personal jurisdiction over a defaulting party before it can render a default judgment. The

Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1340 and 1345

because this case is a civil action arising under 26 U.S.C. 7402(a) and 7408, which is an

Act of Congress providing for internal revenue and because the United States is the

Plaintiff. (Compl. ¶¶ 1, 3.)

While not addressed in either the Complaint or the Plaintiff's Motion for Default

Judgment, for this Court must have personal jurisdiction over the Defendant to enter

default judgment against it. *Cent. Operating Co. v. Util. Workers of Am.*, 491 F.2d 245,

249 (4th Cir. 1974). First, Virginia's long-arm statute must authorize the exercise of

jurisdiction. *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292

(4th. Cir. 2009).    Second, if that authorization exists, then the Due Process Clause of the

Fourteenth Amendment requires that the defaulting defendant has sufficient minimum

contacts with the forum state. *Christian Sci. Bd. Of Dirs. of the First Church of Christ,

Scientist v. Nolan*, 259 F.3d 209, 205 (4th Cir. 2001). Particularly, the Defendant's

conduct must have such a connection with Virginia that it is fair for Defendant to be

required to defend itself in a court in the Commonwealth. *Helicopteros Nacionales de

Colombia S.A. v. Hall*, 466 U.S. 408, 414-15 (1984).

2

In the instant case, the exercise of personal jurisdiction under Virginia's long-arm statute is proper. Specifically, the actions alleged in the Complaint indicate that the Court has personal jurisdiction over Defendant pursuant to Va. Code Ann. § 8.01-328.1(A)(1). § 8.01-328(A)(1) provides that a "court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's ... [t]ransacting any business in the Commonwealth." Defendant operated and promoted the HedgeLoan scheme from offices within Virginia. (Compl. ¶¶ 10, 22, 44; Pl.'s Mem. Supp. Default J. at 11.)

In the instant case, this Court has personal jurisdiction over the Defendant because the Defendant's actions satisfy the constitutional requirements imposed by the Due Process Clause because a substantial part of the events or omissions giving rise to the claims occurred in the forum state. (Compl. ¶ 2, 10, 22, 44); *See Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945) (describing the "minimum contacts" analysis required by the Due Process Clause). Based on the facts alleged in the Complaint, Defendant's acts were not "random, fortuitous, or attenuated" and its transactions with Plaintiff were directly related to its business. *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997). Venue is also proper under 28 U.S.C. § 1391(b) because the transactions and events underlying Plaintiff's claims occurred in this district. (Compl. ¶¶ 2, 10, 22, 44; Pl.'s Mem. Supp. Default J at 11.)

## B. Service of Process

Under Federal Rule of Civil Procedure ("FRCP") 4(h), service upon a corporation, partnership, or other unincorporated association shall be effectuated "in the manner prescribed for individuals by subdivision (e)(1), or by delivering a copy of the

3

summons and of the complaint to an officer, a managing or general agent, or to any other

agent authorized by appointment or by law to receive service of process. . . ." Fed. R.

Civ. P. 4(h). Subdivision (e)(1) provides that service may be achieved "pursuant to the

law of the state in which the district court is located, or where service is made . . . ." Fed.

R. Civ. P. 4(e)(1). Thus, service is proper if it is executed according to Virginia law.

The Virginia long-arm statue provides that the exercise of personal jurisdiction is

proper where a party has acted directly or by agent to transact business in the state. Va.

Code. Ann. § 801-328.1. Therefore, a non-resident defendant who has transacted

business in the state within the meaning of the long-arm statute is amenable to service of

process under Virginia law.

In Virginia, a plaintiff may serve a non-resident, foreign corporation that has

transacted business in the state by serving the Secretary of the Commonwealth with

summons and complaint. *Id.* § 8.01-301(3). However, the law regarding service of

process also provides that process is effective, even where improperly executed, if service

"has reached the party to whom [it] is directed." *Id.* § 8.01-288.

Plaintiff effectively served the Defendant under Virginia law. On September 29,

2010, the Plaintiff's private process server left a copy of the Summons and Complaint at

Daniel Stafford's ("Mr. Stafford"), President of Defendant HedgeLender, Maryland

residence.[2] (Compl.¶ 48; Dkt. No. 9.) Thereafter, Mr. Stafford secured counsel to

represent Defendant in this action. (Dkt. No. 12, Ellen Weis Decl. ¶ 10, Nov. 8, 2011.)

Although Plaintiff did not serve Defendant in strict compliance with the procedures for

---

[2] The Affidavit of Service Returned Executed indicates that the process serve gave the Summons and Complaint to "Nick," Mr. Stafford's son, who appeared as a co- resident and who is at least 18 years of age.

service of process on a nonresident corporation, service reached the Defendant and is therefore effective under Virginia law.

## C.  Grounds for Entry of Default

The Complaint was filed on September 22, 2010. (Dkt. No. 1.) On November 8, 2010, the Plaintiff filed a request for entry of default judgment as to the Defendant as well as Defendants William Chapman ("Chapman"), Alexander Capital Markets, LLC ("Alexander Capital"), and Alexander Financial, LLC ("Alexander Financial"). (Dkt. No. 12.) The Clerk entered default against the Defendants on November 9, 2010. (Dkt. No. 13.) On December 1, 2010, Plaintiff filed a Motion for Default Judgment as to those parties. (Dkt. No. 19.) On December 3, 2010, Plaintiff entered into a consent agreement with Chapman, Alexander Capital, and Alexander Financial that permanently enjoined them from engaging in certain conduct. (Dkt. Nos. 24, 25.) Therefore, at the hearing conducted on December 17, 2010, Plaintiff sought an order for default judgment solely against Defendant. (Dkt. Nos. 24, 26). When no representative appeared at the hearing on the Defendant's behalf, the undersigned Magistrate Judge took the Motion under advisement to issue this Report and Recommendation.

## II.  FINDINGS OF FACT

Since final judgments of permanent injunction have been entered as to the other defendants discussed in Plaintiff's Motion for Default Judgment, this Court limits its findings of facts to those relating to the Defendant who is still before the Court.

Therefore, upon a full review of the pleadings,[3] the undersigned Magistrate Judge finds

that the Plaintiff has established the following facts as to the Defendant.

In 1999 in Reston, Virginia, Mr. Stafford founded an unincorporated entity called

"SAS" group. (Compl. ¶ 22, Pl.'s Mem. Supp. Default J. at 3.) Stafford later

incorporated this entity in 2001 under the laws of Delaware as HedgeLender Corporation

("HedgeLender Corp") and maintained a principal place of business in Reston, Virginia.

(Compl. ¶ 10, 26; Pl.'s Mem. Supp. Default J. at 3.) In 2005, HedgeLender Corp. began

operating as Defendant HedgeLender, LLC. (Compl. ¶¶ 9, 10; Pl.'s Mem. Supp. Default

J. 3.) Stafford and Fred Wahler incorporated HedgeLender under Pennsylvania law and

maintained a principal place of business located in Philadelphia, Pennsylvania. (Compl.

¶¶ 9, 10; Pl.'s Mem. Supp. Default J. 3).

In August 2001, Defendant entered into a joint venture agreement ("Joint Venture

Agreement") with two other entities for the purpose of designing, producing, selling, and

delivering no-margin-call ("non-callable"), no-contingent-liability ("non-recourse") stock

loan products. (Compl. ¶ 35.) Defendant coordinated all marketing efforts and

advertised all of the transactions to potential customers in the non-insurance industry.

(Compl. ¶ 36.) Up until 2010, Defendant advertised and marketed "Flagship

HedgeLoan" and "Capped HedgeLoan" (collectively, "HedgeLoans") on its website

<www.hedgelender.com> and through its web seminars.[4] (Compl. ¶¶ 16, 17; Pl.'s Mem.

Supp. Default J. at 3.) Defendant also promoted the HedgeLoans at trade conferences,

and through presentations to private groups, financial and investment advisors, and stock

---

[3] The pleadings include the Complaint (Dkt. No. 1), Plaintiff's Motion and Memorandum for Default Judgment (Dkt. No. 19), and all of the exhibits attached thereto, as well as Plaintiff's Proposed Discovery Plan filed on December 8, 2010.

[4] Defendant acquired the trademark "HedgeLoan" in 2005 and still maintains it to this day. (Compl. ¶¶ 44, 45; Pl.'s Mem. Supp. Default J. at 5.)

brokers, also known as "Affiliates," who earned referral fees in the amount of three

percent (3%) of the "loan" amount when their clients made a HedgeLoan transaction.

(Compl. ¶¶ 36, 37, 53.)  Defendant also charged the customer an origination fee of up to

five percent (5%) of the "loan" amount.  (Compl. ¶ 37.)

   Defendant marketed HedgeLoans as a way for consumers to transfer their

securities to certain "lenders" as collateral for a loan against the value of those securities.

(Pl.'s Mem. Supp. Default J. at 4.)  Specifically, Defendant promoted HedgeLoans as

"non-recourse, non-callable loan for up to 90% of the value of a customer's securities,"

which the customer transferred to a specific lender as collateral for the loan.  (Compl. ¶¶

58, 60.)  Defendant also advertises to customers that the capital gains from the

HedgeLoans constituted tax free loan proceeds and not income.  (Compl. ¶ 18.)  Other

HedgeLoans terms included in Defendant's marketing materials are: (1) a term of two to

seven years; (2) an above-market rate of interest; (3) any dividends issued on the

securities during the loan are credited against the accrued interest; (4) prepayment of the

principal (and often interest) is prohibited during the loan term; and (5) the customer can

receive the full value of his securities at maturity if he repays the balance of the loan,

regardless of how much those securities have appreciated.  (Compl. ¶ 58.)  The last

provision is not available for customers who transacted for a Flagship Hedge Loan.

(Compl. ¶59.)

   Once a customer entered into a HedgeLoan transaction, Defendant supplied the

customer with a Master Loan Agreement ("MLA") to execute.  (Compl. ¶ 66.)  After

executing the MLA, the customer would be instructed to transfer his securities to a

lender.  (Compl. ¶ 67).  At this point, the lender acquired legal title of the securities;

however, Defendant informed customers that the customers maintained "beneficial ownership" of the securities for the term of the transaction. (Compl. ¶ 68.) Furthermore, Defendant told customers that once they transferred the securities to the lender, the lender would enter into "hedges" with the customers' securities. (Compl. ¶ 69.) Under the terms of the MLA, the lender had no obligation to remit loan proceeds to a customer until it hedged the securities. (Compl. ¶ 72.)

Defendant also advertises to HedgeLoans customers that upon maturity of the loan they can exercise one of three options. (Compl. ¶ 85.) The three options are as follows: (1) customers can "walk away" from the HedgeLoan without making any payments on it, regardless of the value of the securities, which served as collateral for the "loan"; (2) if the value of the securities at maturity is less than the value of the "loan" payoff amount, then customers can pay a fee based on the original hedged value of the securities and renew the transaction, or if the value of the securities at maturity is more than the principal of the loan with interest, then the customers could request that the lender "re-hedge" and enter into a new HedgeLoan transaction; or (3) customers can repay the principal of the "loan" plus the accrued interest and the lender will return the customers' securities or the cash equivalent thereof.[5] (Compl. ¶ 85.)

Defendant marketed HedgeLoans as legitimate loans; however, the true structure of the transaction reveals that the Defendant acted with certain lenders to disguise sales of customers' securities as loans. (Compl. ¶ 73.) In an overwhelming majority of HedgeLoans transactions, the lender sold the customers' securities after obtaining them and then remitted up to 90% of the sales proceeds to the customer as a purported loan.

---

[5] Capped HedgeLoan customers could only receive their securities or the cash value thereof at a fixed percentage above the original value of the securities. (Pl.'s Mem. Supp. Default J. at 7.)

(Compl. ¶ 74.) The amount of the transaction was determined by multiplying the "loan to value" percentage for the transaction by the total value of the proceeds received from the sale of the securities. (Compl. ¶ 79.) The lender retained the remaining sales proceeds for itself and also paid Defendant a portion of the proceeds for its role in the sale and marketing of Hedge Loans. (Compl. ¶ 74.) The lender only profits on each HedgeLoan transaction if the customer does not opt to repay the purported "loan." (Compl. ¶ 96.) Until 2005, Defendant derived all of its income exclusively from the HedgeLoan transactions that it operated with Alexander Financial. (Compl. ¶ 105.)

Defendant knows that the transaction that it markets as a "hedge" is really a sale of the customers' securities in the open market. (Compl. ¶ 77.) Because the lender sold the customers' securities in the open market, the securities are not collateral for a "loan." (Compl. ¶ 81.) Despite this fact, the lender in the joint venture with Defendant sends reports to customers that describe the value of the customer's "collateral" securities, the amount of interest accrued, and any dividends received on the securities. (Compl. ¶ 82.) However, because the securities are sold, no dividends are issued on them; and therefore, no interest is accrued on the securities during the "loan" term. (Compl. ¶ 83.)" Furthermore, the lender does not issue Internal Revenue Service ("IRS") Form 1099s to customers or to the IRS when it sells the customers' securities. (Compl. ¶ 76.)

The actual structure of the HedgeLoan transaction affects the customers' options at "maturity of the loan" in the following ways. When a customer opts to "walk away" from the transaction, which a majority of the customers have done, there are no securities for the customer to forfeit at the end of the transaction because the lender has sold them upon receipt. (Compl. ¶¶ 86, 87.) Since Defendant advertises the HedgeLoans as

"nonrecourse," customers are told that they have no liability to Defendant and lender once they walk away from the transaction. (Compl. ¶ 88.)

For customers who opt to extend the transaction, the customer is told that he may extend the maturity date of the HedgeLoan to a future date of his choosing. (Compl. ¶ 89.) This option implies to customers that they are able to delay any capital gains taxes that might result from entering into a HedgeLoan transaction, which is false. (Compl. ¶ 90.)

The lender does not hedge the securities, but rather sells them. (Compl. ¶ 92.) Furthermore, the Defendant and the lender never conducted upside hedging transactions for each individual HedgeLoan. (Compl. ¶ 93.) Therefore, the lender cannot return the securities or the cash equivalent when a customer chooses the repayment option unless it has sufficient funds to buy back the securities that it sold when the customer transferred them to the lender. (Compl. ¶ 94.) For the HedgeLoans marketed as unlimited upside hedging transactions, this meant that the lender runs the risk of unlimited possibility of losses because the share price of the securities at maturity could be quintupled or higher than the original price. (Pl.'s Mem. Supp. Default J. at 8.)

Defendant relies on using the revenue obtained from the sale of securities of new HedgeLoan customers to acquire the funds necessary to re-purchase and then return securities or the cash equivalent to the existing customers who choose the repayment option upon maturity of their loans. (Compl. ¶ 95.)

In 2007, so many HedgeLoan customers whose "loans" had reached maturity chose to repay the "loan" that the lender lacked sufficient funds to buy back securities or return the cash equivalent to each customer. (Compl. ¶ 97.) Therefore, the lender

defaulted on its obligations under the MLA as it was unable to return to the customer his appreciated securities after the customer tendered repayment of the "loan." (Compl. ¶ 97.)

Nevertheless, through December 2008, Defendant continued to market and implement HedgeLoans with Alexander Financial as well as other companies. (Compl. ¶¶ 100, 104.) In July 2008, Defendant entered into a partnership with "EZStockLoan," a company that offers so called "stock loans" to the public. (Compl. ¶ 107.) Defendant also partnered with One Equity Corporation ("OEC") to serve as the lender for the "Star HedgeLoan" in 2006 and 2007. (Compl. ¶¶ 106, 110.)

The "Star HedgeLoan" operated on substantially all of the same terms as the other HedgeLoans except that Defendant told customers of this particular loan that they could receive cash equal to a maximum of eighty-five percent (85%) of the value of their securities as "loan proceeds." (Compl. ¶ 111.) Furthermore, the customer of the Star HedgeLoan, unlike other HedgeLoans customers, could prepay the loan after the first three months of the purported loan term. (Compl. ¶ 111.) In conjunction with OEC and other lenders, Defendant marketed this loan and other HedgeLoan products that purportedly allowed customers to use stock loans to acquire tax-free income. (Compl. ¶ 109.)

By 2008, more than $268 million in securities and more than 350 customers had transacted in the HedgeLoan scheme. (Compl. ¶ 128; Pl.'s Mem. Supp. Default J at 9.) This figure only relates to those transactions that Defendant conducted with the joint venture agreement lender, Alexander Financial. (Pl.'s Mem. Supp. Default J. at 9.)

Furthermore, this figure does not account for those transactions that Defendant initiated after 2008. (Pl.'s Mem. Supp. Default J. at 9.)

Between 2007 and 2009, the U.S. Securities and Exchange Commission ("SEC") discovered that OEC, like Alexander Financial, sold Star HedgeLoans customers' securities instead of hedging them as marketed. (Compl. ¶ 112; Pl.'s Mem. Supp. Default J. at 10.) In 2009, the SEC sued the Defendant, and the two entered into a consent injunction to stop the promotion of its Star HedgeLoans. (Compl. ¶ 113.) The permanent injunction order also required Defendant, Mr. Stafford, and others to "pay disgorgement of ill-gotten gains . . . and a civil penalty." (Compl. ¶ 113.) Despite this fact, Defendant has continued to market other HedgeLoan schemes until and through the public disclosure of an IRS investigation of the company. (Pl.'s Mem. Supp. Default J. at 10.) Specifically between 2006 and June 2009, Defendant transacted 200 supposed stock loans with Alexander Financial and other "lenders." (Compl. ¶ 115.) As previously stated, up until 2010, Defendant continued to promote HedgeLoans on its website.

After conducting audits of some HedgeLoans customers, the IRS has determined that the HedgeLoan schemes have helped customers to evade taxes and hindered the Agency's efforts to administer federal tax laws. (Compl. ¶ 126, 127.) Furthermore, between 2001 and 2008, Defendant's promotion of HedgeLoans caused more than $268 million in taxable sales of securities for more than 350 customers. (Compl. ¶ 128.) The IRS has determined that the average amount of under-reported income for HedgeLender customers has resulted in an average deficiency of $85, 641 in income tax owed per customer. (Compl. ¶ 130.) As a result, the Agency estimates a total loss in income tax in the amount of as much as $30 million.

## III. <u>EVALUATION OF PLAINTIFF'S COMPLAINT</u>

A defendant in default admits the factual allegations in the complaint. Fed R. Civ.

P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is

admitted if a responsive pleading is required and the allegation is not denied."); *see also*

*GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va.

2003) ("Upon default, facts alleged in the complaint are deemed admitted and the

appropriate inquiry is whether the facts alleged state a claim.") Thus, in issuing this

Report and Recommendation, the undersigned Magistrate Judge must analyze Plaintiff's

claims under 26 U.S.C. §§ 6700, 7402(a) and 7408 to determine whether Defendant's

conduct falls within the purview of the statute and whether injunctive relief is the

appropriate remedy.

Injunctive relief is an appropriate remedy for a Plaintiff under § 7408 where a

defendant has engaged in conduct that the court finds subjects them to penalty under §

6700 of the Internal Revenue Code ("IRC"), and an injunction is necessary to prevent

reoccurrence of this conduct. 26 U.S.C. § 7408 (b). A person or entity acts to violate §

6700 of the IRC where that person: (1) organized or sold, or participated in the

organization or sale of a plan, or arrangement; (2) the person made or furnished or caused

another to make or furnish, false or fraudulent statements as to tax benefits derived from

the plan or arrangement; (3) the false or fraudulent statements pertain to a material matter

in connection with the sale; (4) the defendant knew or had reason to know the statements

were false or fraudulent. 26 U.S.C. § 6700. Plaintiff must plead facts sufficient to satisfy

all of the elements of § 6700 and also demonstrate that such conduct will occur in the

future unless the party is enjoined by this Court. *United States v. Estate Preservation Servs.*, 202 F.3d 1093, 1098 (9th Cir. 200).

A.   *Participation in Organization and Sale of Plan or Arrangement*

The HedgeLoans are a plan or arrangement within the meaning of § 6700 because the Defendant markets the HedgeLoans as true loans, which are not subject to income tax. A plan or arrangement is a tax shelter within the meaning of § 6700 where it has some connection to taxes. *United States v. Raymond*, 228 F.3d 804, 811 (7th Cir. 2000). Since the Defendant promoted the HedgeLoans transactions as "loans," which has tax implications for customers, then the transactions have some connection to taxes and are a "plan or arrangement" within the meaning of § 6700.

Furthermore, by being exclusively responsible for the promotion of the HedgeLoans under the joint venture agreement, and by often supplying the HedgeLoan MLA to customers, Defendant has participated in the organization and sale of the plan or arrangement within the meaning of § 6700.

B.   *Making False or Fraudulent Statements Pertaining to a Material Matter in Connection with the Sale of the Plan or Arrangement*

Defendant makes false or fraudulent statements as to a material matter in connection with the HedgeLoans transactions when it (1) tells customers that HedgeLoans are loans and not sales, (2) tells customers that their securities serve as collateral for the loans, and (3) when it states that the lender hedges the customers' securities to return them at maturity of the loan.

The HedgeLoans are sales and not loans as purported by the Defendant because for purposes of determining federal tax consequences a sale occurs where legal title of property is transferred for a fixed amount of money or its equivalent. *Comm'r v. Brown*,

380 U.S. 563, 570-71 (1965). A transfer of property exists where there is a shift in the burdens and benefits of ownership from one party in the transaction to another. *Gray v. Comm'r*, 561 F.2d 753, 757 (9th Cir. 1977).

Courts have considered a number of factors when determining whether a transfer of property occurs in such a way as to constitute a sale. *Grodt & McKay Realty v. Comm'r.*, 77 T.C. 1221, 1238 (1981); *Calloway v. Comm'r*, 135 T.C. 26, 27 (2010). Among other factors, the court considers (1) whether legal title passes; (2) whether an equity was acquired in the property; (3) whether the contract creates a present obligation on the seller to deliver the property and on the purchaser to make payments; (4) whether the purchaser has a vested right to possess the property;(4) which party bears the risk of loss to the property; and (5) which party receives the profits from the operation and sale of the property. *Grodt & McKay Realty*, 77 T.C. at 1237-38.

Applying these factors, this Court finds that the HedgeLoans transactions constitute a sale of the customers' securities to the lender. The MLA executed by the parties requires the customer to transfer legal title to the shares so that that they can be sold. Furthermore in exchange for payment, the lender also receives all property interest in the securities including the equity of the securities, any dividends issued on them, and the right to possess them. Furthermore, the lender and not the customer bears the risk of loss in the event that, at maturity, the securities are valued at significantly more than the price of the principal sum plus accrued interest. This is because once the lender sells the stock, it is required to repurchase it or give the cash equivalent when a customer exercises his right to repay and demand return of the securities. Other courts in reviewing substantially similar loan schemes have weighed the substance of the transactions against

the factors articulated in *Grodt* and have determined that such ninety percent (90%) stock loan programs are sales under the tax code. *Calloway*, 135 T.C. at 14-28 (finding that the ninety percent (90%) stock loan program engaged in by the taxpayer constituted a sale of securities and noting that other courts have used the *Grodt* factors to make the same determination about that particular program).

Therefore, when Defendant marketed the HedgeLoans as loans it made a false statement and caused its affiliates to make false statements in connection with the sale of the HedgeLoan plan or arrangement.  This Court also finds that Defendant makes a false statement in connection with the sale of the plan when it advertises that the customers' securities serve as collateral.  To the extent that the transfer of the securities to the lender in exchange for payment is a sale, this Court finds that the securities cannot serve as collateral for a loan that does not exist.  For similar reasons, this Court finds that the Defendant makes false statements in connection with the sale of a plan when it advertises that the lender hedges the customers' securities to return them at the maturity of the loan. As previously mentioned, the lender sells the securities; therefore, no hedge transaction ever takes place.

C.     *The Defendant Knew or Had Reason to Know That it Made False Statements*

As an organizer and primary marketer of the HedgeLoan plan, Defendant should have known that its statements describing the transaction as a loan and stating that the lender hedges the customers' securities to return at maturity were false statements.  A party should know that its statements are false if a reasonable person in the party's position would have known that such statements were false. *United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1103 (9th Cir. 2000)

16

First, the Complaint alleges, and by failing to answer, the Defendant admits that it knew that no hedging transactions were taking place even though it advertised that customers' securities would be hedged as a part of the HedgeLoans transactions. Furthermore, to the extent that Defendant significantly participated in the organization and marketing of the HedgeLoan transactions, and is owned and operated by Mr. Stafford, a person with significant knowledge of this industry,[6] Defendant was in a position to know that the transaction did not constitute a loan and that no hedging transactions took place.

For the aforementioned reasons, this Court finds that Plaintiff has demonstrated that Defendant's conduct in promoting, advertising, and marketing HedgeLoans violates § 6700. To receive the injunctive relief that it requests, Plaintiff must further demonstrate that such relief is appropriate to prevent the recurrence of Defendant's conduct.

D.    *Injunctive Relief*

Pursuant to § 7402 (a) and § 7408, in a civil action brought by the United States, this Court may enjoin a party from engaging in conduct that violates § 6700 where injunctive relief is appropriate to enforce the tax code and to prevent a recurrence of such conduct. 26 U.S.C. §§ 7402(a), 7408. When making a determination about whether permanent injunctive relief is appropriate under either section, the Court need not employ traditional analysis, which requires a showing of irreparable injury and that a legal remedy would not be adequate. *Abdo v. IRS*, 234 F.Supp.2d 553, 564 (M.D.N.C. 2002),

---

[6] In Mr. Stafford's Answer to the Complaint he admits that he has a bachelor's degree in Economics, a master's degree in International Relations and Business and worked at the United States Department of Commerce, and that he developed and offered a financial product called SecureLoan. (Dkt. No. 10 ¶ 21, 22, 28.)

17

*aff'd*, 63 Fed. Appx. 163 (4th Cir. 2003); *United States v. Renfrow*, 677, 685 (E.D.N.C.

2009). Instead the court considers:

> the gravity of the harm caused by the offense; (2) the extent of the defendant's
> participation and his degree of scienter; (3) the isolated or recurrent nature of
> the infraction and the likelihood that the defendant's customary business
> activities might again involve him in such transactions; (4) the defendant's
> recognition of his own culpability; and (5) the sincerity of his assurances
> against future violations.

*Abdo*, 234 F. Supp.2d at 565. Weighing these factors, this Court finds that injunctive

relief is appropriate under both § 7402(a) and § 7408. Specifically, Defendant has

promoted and marketed HedgeLoans, and as a result, hundreds of customers have

engaged in transactions. Through audits of some HedgeLoans customers, the IRS has

determined that these customers have failed to report income, which on average, results

in $85,641 in income tax deficiency per customer. In total, the IRS estimates that it has

lost income in the approximate amount of $30 million in unpaid taxes involving all

HedgeLoans customers. In addition, the Agency will have to utilize significant resources

to continue audits of HedgeLoans customers. This is a significant harm to society

because it promotes noncompliance with federal tax laws and is a great cost to the public.

Furthermore, Defendant has knowledge that its conduct violates federal laws and

has participated in continuing such conduct. At a minimum, the SEC action along with

similar recourse by the Oklahoma Department of Securities made Defendant aware that

its actions in the marketing and promotion of HedgeLoans violated federal tax laws.

Nevertheless, Defendant continued to market these products on its website and expand its

network of Affiliates. The same facts can be used to demonstrate that Defendant's

conduct is not an isolated infraction and that it is likely that Defendant would engage in

such conduct in the future. Although, some attempts have been made to dissolve the

Defendant entity, at the time of Plaintiff's filing its motion for default judgment,

Defendant still existed as an incorporated entity. (Dkt. No. 19, Exh. 10.) Therefore, this

Court finds that a permanent injunction under §§ 7402(a) and 7408(b) is an appropriate

remedy. Consequently, this Court recommends that Plaintiff's motion be granted in this

respect.

## IV. RECOMMENDATION

For the reasons articulated above, the undersigned Magistrate Judge recommends

that the Plaintiff's Motion for Default Judgment be GRANTED, and that a permanent

injunction be entered against Defendant HedgeLender, LLC, which prohibits it from

engaging in the conduct described above and in the Complaint.

## V. NOTICE

**By mailing copies of this report and recommendation, the parties are notified**

**as follows. Objections to this report and recommendation must, pursuant to 28**

**U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, be filed within**

**fourteen (14) days of service on you of this report and recommendation. A failure to**

**file timely objections to this report and recommendation waives appellate review of**

**the substance of the report and recommendation and waives appellate review of a**

**judgment based on this report and recommendation.**

The Clerk is directed to send a copy of this Report and Recommendation to

counsel of record and Defendant at the following address:

> HedgeLender, LLC
> 1500 Market Street
> Suite 1201
> Philadelphia, PA 19102

_/s/_

Ivan D. Davis
United States Magistrate Judge

May 23, 2011
Alexandria, Virginia